UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) No. 8:22-cr-00259-WFJ-AEP |
| | ) |
| PENNY HESS, | ) |
| | ) |
| Defendant. | ) |

**DEFENDANT PENNY HESS'S MOTION IN LIMINE TO EXCLUDE CO-CONSPIRATOR STATEMENTS UNDER FED. R. EVID. 403 & 801(d)(2)(E)**

Defendant, PENNY HESS,[1] by her attorneys, respectfully moves *in limine* for an order excluding (1) conversations between Defendant Alexander Ionov and the individuals identified by the government as Popov, Sukhodolov, Vistoropskiy, and Mityagin and (2) Ionov's "handler reports." In support, Defendant states as follows:

**I.    Introduction**

The government intends to introduce (1) chat conversations between Popov, Sukhodolov, Vistoropsky, and Mityagin ("alleged Russian co-conspirators") and Ionov; and (2) "handler reports" purportedly authored by Ionov. Those messages and reports are attached as Exhibits A and B. The messages are between Ionov and alleged FSB officers, and the handler reports appear to describe Ionov's interactions with various activist groups. In these reports and chats, Ionov tells stories about the

---

[1] This Motion in Limine is filed on behalf of Defendant Penny Hess, although the arguments set forth apply equally to the other African People's Socialist Party (APSP) Defendants, Omali Yeshitela, and Jesse Nevel.

APSP Defendants that are provably false, apparently to impress the alleged Russian co-conspirators or gain grants. The government presumably intends to argue that this evidence is admissible as co-conspirator statements under Federal Rule of Evidence 801(d)(2)(e).

The alleged Russian co-conspirators' statements should be excluded because there is no substantial, independent evidence that they were members of the alleged conspiracy or that their statements were made in furtherance of the alleged conspiracy. Fed. R. Evid. 801(d)(2)(E). Ionov's statements should be excluded because they are not in furtherance of the alleged conspiracy and their probative value is substantially outweighed by a danger of unfair prejudice, confusing the jury, misleading the jury, undue delay, and wasting time. Fed. R. Evid. 403 and 801(d)(2)(E).

**II.     The alleged Russian co-conspirators' and Ionov's messages are hearsay as they do not satisfy the requirements of Federal Rule of Evidence 801(d)(2)(E), and Ionov's statements in the messages and handler reports should be excluded under Federal Rule of Evidence 403.**

Hearsay is inadmissible unless it falls under an exception or is deemed not hearsay under Federal Rule of Evidence 801(d). Rule 801(d)(2)(e) provides that a statement is not hearsay if it "is offered against an opposing party and . . . was made by the party's coconspirator during and in furtherance of the conspiracy." To be admissible under Rule 801(d)(2)(E), "the Government must first establish the following by a preponderance of the evidence: (1) that a conspiracy existed; (2) that

2

the conspiracy included the declarant and the defendant against whom the statement is offered; and (3) that the statement to be introduced was made during the course and in furtherance of the conspiracy." *United States v. Dickerson*, 248 F.3d 1036, 1049 (11th Cir. 2001) (citing *Bourjaily v. United States*, 483 U.S. 171, 175 (1987)).

    **A.**    **The alleged Russian co-conspirators' statements should be excluded as hearsay unless the government produces substantial, independent evidence that they are co-conspirators.**

"[S]tatements of a co-conspirator may be admitted under [Rule 801(d)(2)(E)] if there is substantial, independent evidence of the existence of the conspiracy at least enough to take the question to the jury; that the defendant and declarant were both members of the conspiracy; and that the statements were made in the course of and in furtherance of the conspiracy." *United States v. McDonald*, 935 F.2d 1212, 1220 (11th Cir. 1991) (internal quotations omitted); *see also United States v. Hasner*, 340 F.3d 1261, 1274 (11th Cir. 2003) ("The contents of the statement do not alone suffice to establish a conspiracy in which the declarant and the defendant participated."). "[W]hen the preliminary facts relevant to Rule 801(d)(2)(E) are disputed, the offering party must prove them by a preponderance of the evidence. *Bourjaily*, 483 U.S. at 176.

Here, the government has produced no independent evidence that the alleged Russian co-conspirators were members of a conspiracy. The government presumably intends to rely on hearsay statements contained in their chat conversations with

Ionov to establish that they are co-conspirators. Absent independent evidence of their membership in the conspiracy, however, their statements are not admissible under Rule 801(d)(2)(E). Their statements, therefore, should be excluded as hearsay.

> **B. Ionov's statements should be excluded as they are not in furtherance of the conspiracy and their probative value is substantially outweighed by a danger of unfair prejudice, confusing the issues, misleading the jury, undue delay, and wasting time.**

Not all statements about a conspiracy are in furtherance of the conspiracy. "A statement made in furtherance of a conspiracy must somehow advance the objectives of the conspiracy, not merely inform the listener of the declarant's activities. *United States v. Moss*, 138 F.3d 742, 744 (8th Cir. 1998). Retrospective statements about past events not intended to further involvement in the conspiracy are not in furtherance of the conspiracy. *See United States v. Phillips*, 664 F.2d 971, 1027 (former 5th Cir. 1981), overruled on other grounds, *United States v. Huntress*, 956 F.2d 1309 (5th Cir. 1992). "[S]tatements are not in furtherance of the conspiracy if they are mere narratives, that is "statements relating to past events, even those connected with the operation of the conspiracy where the statement serves no immediate or future conspiratorial purpose." *United States v. Perez*, 989 F.2d 1574, 1578 (10th Cir. 1993). Moreover, "[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403.

4

Here, Ionov's statements in the chat messages and handler reports do not advance the objectives of the conspiracy as they are merely retrospective and unreliable. Moreover, Ionov's statements, which falsely describe defendants' and others' activities for Ionov's own purposes, should be excluded under Rule 403 as their probative value is substantially outweighed by a danger of unfair prejudice, confusing the issues, misleading the jury, undue delay, and wasting time.

Ionov made his alleged FSB handlers victims of his own propaganda and disinformation by consistently supplying them with fraudulent metrics of his performance. In particular, Ionov misrepresents the African People's Socialist Party ("APSP") Defendants'[2] and others' activities and his own involvement in those activities to garner favor with the alleged FSB officers.

The following are just a few examples of the false information that Ionov provided the alleged Russian co-conspirators about the APSP Defendants. The following conversation is purportedly between Ionov and Sukhodolov on June 28, 2019:

>    Ionov:      So I have the elections
>                46%
>                On exit polls
>    Sukhodolov: Did she lose?
>    Ionov:      No
>                They are on August 26
>                I think the black female will make it through
>    Sukhodolov: Ah . . . It would be good

---

[2] The APSP Defendants include Omali Yeshitela, Penny Hess, and Jesse Nevel.

5

    Ionov:        For sure
                       I do consulting every week
                       We'll be doing our best
    Sukhodolov:  Go ahead
    Ionov:        We're doing our best

On the same day, Ionov had the following chat conversation with Mityagin:

    Mityagin:    Tell me who Eritha is. Is she a human rights activist, a mistress of Hess, or just an activist?
    Mityagin:    How much money was collected through crowd funding campaigns? Was 450 bucks enough to organize a headquarters, agitation materials, etc.? Or [was it taken] out of the total?

. . .

    Ionov:        I alone sent 450 . . . but I do not know how much was collected in total. I know that during those, um, events I participated in, in marathons, they were collecting, um, at least one and a half from-from each person. In addition, they were collecting at the conferences they organized, those you had to pay for. I think that they . . . collected, um, about 20-30 thousand dollars over there for sure. At a minimum

. . .

    Mityagin:    Do you know what percentage of residents supports Eritha?
    Ionov:        Penny speaks about 46%

Despite access to over 20 terabytes of data, including Canion's campaign finance records, phone, emails, and other online accounts; Ionov's cloud and financial records; and APSP computers, there is no evidence that Ionov was involved in any way in Canion's campaign. Specifically, there is no evidence that Ionov donated to or consulted on the campaign. Neither is there evidence that defendant Penny Hess told Ionov that 46% of residents supported Canion. Ionov apparently

6

created this number to impress the alleged FSB officers, perhaps in an attempt to earn government grant money by making up stories. Indeed, in the primary Canion received 23.91% of the vote, and the other candidate received 57.39% of the vote.[3] Exh. C. In the general election, Canion received 18% of the vote.[4] Exh. D.

The "handler reports" are similarly full of false statements. Below are only a select few of Ionov's misrepresentations. The report entitled "Doc 1" states:

> Omali gave Aleksandr some contact information for city council local member Jeremy Elisson [PH] [Dzheremi Elisson [ICST]]. He was with the protesters, and during his conversation with Ionov via Skype he shared his take on the situation: These police officers should be arrested no later than today. Senator Amy Klobuchar is calling for some sort of investigation, but all the law enforcement officers are running free, and the prosecutor has never initiated a single case or pressed any charges, "What is there to investigate at all?! This police officer is a murderer, and the other police officer is an accomplice to a murder." In addition, Jeremy commented on the situation related to the use of force against protesters, "I was here on the South Side (of the city), helping people, as much as I could, with milk, water, and towels. So far, I had failed to prevent the police from firing guns indiscriminately into the crowd. I saw a horrifying scene: there were some very young protesters in the crowd, children, who were being shot at with rubber bullets by the police. I even had to render assistance: I held a towel to a teenage girl's bleeding head.

---

[3] D'Ann Lawrence White, *Primary Results: Montanari, Cox, Wheeler-Bowman Top Vote-Getters*, Patch, https://patch.com/florida/stpete/primary-results-montanari-cox-wheeler-bowman-top-vote-getters.
[4] Josh Solomon, *Lisa Wheeler-Bowman easily wins re-election in St. Pete's District 7 council race*, Tampa Bay Times, https://www.tampabay.com/news/st-petersburg/2019/11/06/lisa-wheeler-bowman-leads-in-district-7-st-petersburg-city-council-election/.

7

There is no evidence, however, that Defendant Omali Yeshitela shared Elisson's contact information with Ionov. Neither is there evidence that Ionov had a Skype conversation with Elisson. Rather, Ionov copied and pasted the alleged Skype conversation contents from an article he found on the internet.[5] Exh. E.

Ionov states in the same report:

> Three Uhuru[6] activists sustained some injuries from the crowd-control weapons. One person was hospitalized. In Omali's opinion, the movement will seek to prosecute the police officer who hit an activist with a wooden club although the latter had his hands up to show he was not a threat.

No APSP activists were injured in Minneapolis. A non-APSP activist, however, was hit with a wooden baton. It is likely that Ionov copied the foregoing information from *The New Yorker* article entitled *The Heart of the Uprising in Minneapolis*.[7] Exh. F.

Ionov also falsely attributed several photographs to APSP activists that he apparently downloaded from another organization's website. For instance, the following photograph includes a caption that reads: "Female activists from the Uhuru movement and African Union of Women." These women, however, are

---

[5] *'A Disgusting Display': Police Fire Rubber Bullets, Stun Grenades, and Tear Gas at Demonstrators Protesting Killing of George Floyd*, Common Dreams, https://www.commondreams.org/news/2020/05/27/disgusting-display-police-fire-rubber-bullets-stun-grenades-and-tear-gas?fbclid=IwAR2Is7rik8TncrRBKFLaqQOTSAKoCXeEcL6cr89LfdcN30ghng-scy0RhIY.
[6] Ionov refers to APSP as "Uhuru."
[7] Luke Mogelson, *The Heart of the Uprising in Minneapolis*, The New Yorker (Jun. 15, 2020), https://www.newyorker.com/magazine/2020/06/22/the-heart-of-the-uprising-in-minneapolis

clearly not from the APSP. Rather, their sign indicates that they are activists from the Twin Cities Coalition for Justice.[8]



A report entitled F6357172-0169-45EA-B257-DCDF07D0F854.pdf states:

> After Omali Yeshitela's visit to Moscow in 2015, a bilateral cooperation program between ADR and Uhuru was developed including a reparations program for African-American population in the US. The reparations campaign was first introduced at the federal 'The Black is Back' Coalition conference. Based on Aleksandr's and Omali's decision, it was decided to conduct a reparations tour in eight US states at the end of 2015. Aleksandr financed this campaign fully. During the tour, activists noted significant interest from the civilian community in the cause of reparations for African-American population.

These statements are false. Ionov did not help develop a reparations program; rather, reparations has been a main feature of APSP since the 1970s.[9] Exh. G. There is no evidence, and the indictment does not allege, that Ionov developed a reparations program with APSP. Although the APSP Defendants participated in the

---

[8] See TCC4J, Facebook, https://www.facebook.com/TCC4J.
[9] *See, e.g.*, *The Working Platform of the African People's Socialist Party: What We Want – What We Believe*, The Burning Spear 37 (Dec. 1979),
https://newspapers.uflib.ufl.edu/AA00069330/00049/images/31 (reparations is part of the APSP platform).

Africans Charge Genocide Winter Encampment Tour in the beginning of 2016 that toured four states, there was no reparations tour in eight states at the end of 2015. Moreover, the 2016 tour focused on the genocide of Africans, not the topic of reparations. Obviously, Ionov could not have fully financed a campaign that did not occur.

The report entitled "report 12th of June 12 2020.docx" states:

Cumulative Report on the U.S. Campaigns

Aleksandr Ionov conducted telephone negotiations with Penny Hess and Jaycee Nevelski [PH] [Dzheysi Nevelski [ICST]], because the consultations held earlier had resulted in agreements to organize a number of events to support the African-Americans in both online and offline formats. In addition, in her dialogue Penny reminded that their efforts of almost five years were not fruitless: many activists prepared through collaboration between ADR and Uhuru take to the streets and lead the way for hundreds of people. Since 2015 the following joint campaigns have been held:
-Conferences for local African-American organizations (the African People's Party forums) which were consistently sponsored by ADR and provided with information support.
-Campaigns in Ferguson and Baltimore where the well-known quote 'Black lives matter' was coined. ADR provided substantial support to meetings and conferences while actively supporting the Black is Back Coalition.
-Organizing the reparations marathon in over 40 cities and providing support to the activist school which prepared most of the active Uhuru members.
-Information resources including joint statements and starting radio station 96.6 FM.

There is no independent evidence that any of these statements are true. For example, there is no evidence that Ionov "actively sponsored" or provided

information support for APSP conferences. Ionov takes credit for helping APSP coin the phrase "Black Lives Matters," but this phrase was not created or even used by APSP. To the contrary, the APSP expressed disapproval of the Black Lives Matter movement.[10] Exh. H. There was no reparations marathon "in over 40 cities," and no evidence indicates that Ionov sponsored a reparations marathon. Finally, Ionov was not involved in opening APSP's radio station.

A report entitled "Report 23 October 2020.docx" states that Ionov negotiated with Defendant Omali Yeshitela to hold a "reparations tour in November 2020," and that Ionov donated $1,100 for the APSP to purchase banners and microphones. APSP did not hold a reparations tour in November 2020 and there is no evidence that Ionov donated the $1,100. A report entitled "Friday the 13th document" indicates that Ionov spoke with Defendant Penny Hess about Defendant Omali Yeshitela's speech at San Diego State University. The report claims that the "lecture aroused sufficient resonance and interest from young activists" and "32 people signed up for the Uhuru movement." Although Defendant Yeshitela was invited to speak at San Diego University, the event never took place.[11] Exh. I.

---

[10] *See, e.g.*, Omali Yeshitela, *Black Lives Matter: Opportunism by any name must be exposed!*, The Burning Spear (Oct. 6, 2015), https://theburningspear.com/black-lives-matter-opportunism-by-any-name-must-be-exposed/.

[11] *See, e.g.*, *Debate over San Diego State speakers ignites hate speech outrage*, ABC 10 News San (Feb. 19, 2020), https://www.10news.com/news/local-news/debate-over-guest-speakers-at-sdsu-ignites-outrage-after-protestors-use-anti-semitic-tropes-during-rally.

Counsel has verified with other activist groups that Ionov's statements about their organizations are false. It is obvious that some of the conversations Ionov claims to have had with other activists were copied and pasted from the internet. For instance, in a report entitled "Report 3 September 2020," Ionov states he had telephone conversations with Frank Chapman in which they discussed Chapman's organization's actions:

> Alexander Ionov held telephone conversations with Frank Chapman, during which the latest actions of the alliance and the committee were discussed.
>
> On August 28, a rally and march took place in Kenosha, organized by CPAC, the Chicago Anti-War Committee and the Milwaukee Alliance Against Political Repression. Frank Chapman personally arrived at the event and gave a speech at it.
>
> The event drew more than 200 people to the Kenosha Municipal Courthouse to demand justice for Jacob Blake and the victims of killer Kyle Rittenhouse. The rally was organized by the Milwaukee Alliance Against Racism and Political Repression with support from UW-Parkside Students for a Democratic Society, Kenosha EquiTeens, Wisconsin Freedom Road Socialist Organization and the Chicago Alliance. Many in the crowd held signs reading "Stop Police Crimes! Demand a council on community oversight of the police!"
>
> After the rally, protesters marched through the city streets. They walked through working-class neighborhoods where many blacks and Latinos live. Marchers chanted slogans such as "No justice, no peace, fuck the racist ass police" and "Jacob Blake" as bystanders pledged their support. Many people came out of their homes with their families and raised their fists. Cars passing by threw their fists out the window and honked their horns. Some even stopped and sang along with the marchers as they passed.

> Towards the end of the march, several military trucks were seen heading towards the protest. In a show of people power, demonstrators stopped trucks on the road. They hung their signs on the windshield and shouted chants. Kenosha is currently occupied by more than 2,000 National Guard troops.
>
> Kenosha police and other officials have doubled down on protecting their officers. Kenosha Police Chief Daniel Miskinie said his officers did nothing wrong by allowing killer Rittenhouse to remain free at home.
>
> The situation in Kenosha remains tense as local authorities cannot resolve the conflict peacefully, and also maintain police officers under house arrest during the investigation.

Ionov, however, obviously copied this content from an internet article entitled *Kenosha march demands justice for Jacob Blake and victims of killer Kyle Rittenhouse* on Fight Back! News.[12] Exh. J.

Ionov's statements in the chats and reports are hearsay and not admissible under Rule 801(d)(2)(e). First, the statements contain numerous falsehoods, which clearly cannot further the objectives of a conspiracy to act in the United States at the direction or control of a foreign government without notifying the Attorney General. Rather, these statements appear to further Ionov's attempt to garner favor with the alleged FSB agents, perhaps to obtain grant money. Second, the statements are not in furtherance of the conspiracy as they are merely retrospective statements about various activists' activities. *See Perez*, 989 F.2d at 1578 (mere narratives about a

---

[12] Kenosha march demands justice for Jacob Blake and victims of killer Kyle Rittenhouse, Fight Back! News (Aug. 30, 2020), https://fightbacknews.org/articles/kenosha-march-demands-justice-jacob-blake-and-victims-killer-kyle-rittenhouse.

13

conspiracy's past events are not in furtherance of the conspiracy). Rather, Ionov's statements to his Russian colleagues are classic hearsay: out-of-court statements about the defendants on trial, offered to prove the truth of the matter asserted.

Ionov's statements should also be excluded under Rule 403 as their probative value is substantially outweighed by unfair prejudice, confusing the issues, misleading the jury, undue delay, and wasting time. Ionov's statements have little probative value as they are obviously false. The statements are also unfairly prejudicial to the APSP defendants as they falsely indicate that the APSP engaged in conversations and actions with Ionov. For the same reason, these statements will confuse the issues and mislead the jury to believe that the APSP defendants engaged in activities with Ionov that never actually occurred.

Finally, the introduction of these statements will cause undue delay and waste time. As the chats and reports are full of false information, the APSP defendants will have to put on a significant amount of evidence and witnesses to show that Ionov's statements in the chats and reports are false. This evidence may include calling other activists named in the statements who have verified that Ionov's statements are false.

Accordingly, Ionov's statements should be excluded. His statements are hearsay as they do not meet the requirements of Rule 801(d)(2)(e). Moreover, his statements should be excluded because their probative value is substantially

outweighed by unfair prejudice, confusing the issues, misleading the jury, undue delay, and wasting time.

### C. Conclusion

WHEREFORE, based on the foregoing, Defendant PENNY HESS respectfully requests that the Court exclude the chats between Ionov and the alleged Russian co-conspirators and the handler reports.

                                                            Respectfully submitted,

                                                         /s/ Angela J. Reaney
                                                       ANGELA J. REANEY

Leonard C. Goodman
Angela J. Reaney
Goodman Law Office
53 W. Jackson
Suite 1650
Chicago, Illinois  60604
(312) 986-1984

CERTIFICATE OF SERVICE

    I hereby certify that on August 21, 2024, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record via transmission of Notices of Electronic Filing generated by CM/ECF.

                                                        /s/   Angela J. Reaney

Angela J. Reaney
53 W. Jackson
Suite 1650
Chicago, Illinois 60604
(312) 986-1984